IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**EQT GATHERING, LLC, a**
**Pennsylvania Limited Liability Company,**

      **Plaintiff,**

v.                                       CIVIL ACTION NO. 2:18-cv-00392

**THE TRAVELERS INDEMNITY**
**COMPANY, a foreign corporation; and**
**TRAVELERS CASUALTY**
**INSURANCE COMPANY OF AMERICA,**
**a foreign corporation.**

      **Defendants.**

## COMPLAINT

For its Complaint against Defendants The Travelers Indemnity Company and Travelers Casualty Insurance Company of America, EQT Gathering, LLC, by and through their counsel, R. Scott Long, Esquire, and David F. Nelson, Sr., Esquire, and the law firm of Hendrickson & Long, PLLC, states as follows:

## PARTIES

1. EQT Gathering, LLC (hereinafter "EQT") is a Delaware Limited Liability Company with its principal place of business in Pennsylvania. Its sole member is EQT Gathering Holdings, LLC.

2. EQT Gathering Holdings, LLC is a Delaware Limited Liability Company with its principal place of business in Pennsylvania. It is a citizen of Pennsylvania and Delaware. Its

sole member is EQT Production Company. Kentucky West Virginia Gas Company, LLC, had been previously merged into EQT Gathering Holdings, LLC, on June 30, 2008.

3. EQT Production Company is a Pennsylvania corporation, and its principal place of business is in Pennsylvania. It is a citizen of Pennsylvania.

4. The Travelers Indemnity Company ("Travelers"), a Connecticut Corporation, is a foreign insurance company permitted to conduct business in the State of West Virginia and in the Commonwealth of Pennsylvania, with its principal place of business in Hartford, Connecticut. Travelers is the current parent company of Travelers Casualty Insurance Company of America.

5. Travelers Casualty Insurance Company of America ("Travelers Casualty"), a Connecticut corporation, is a foreign insurance company permitted to conduct business in the State of West Virginia and in the Commonwealth of Pennsylvania, with a principal place of business in Harford, Connecticut.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) as defendants have conducted business in this judicial district. In particular, both Travelers and Travelers Casualty issued insurance policies to Pete Gould & Sons, Inc. ("Gould"), which is a West Virginia corporation with its principal place of work in this judicial district. Both EQT and defendants Travelers and Travelers Casualty also conduct business in this judicial district, and therefore Defendants are subject to this Court's personal jurisdiction.

## FACTS

8. EQT collects natural gas from wellheads across the Appalachian region and, through a network of gathering pipes, moves the gas to third-party processing facilities.

9. Gould is a natural gas pipeline construction and excavation company.

10. EQT is the owner of a certain Right-of-Way ("ROW") located in Armstrong County, Pennsylvania, near the town of West Franklin, Pennsylvania.

11. Pursuant to a Master Construction Services Agreement ("MCSA") between Gould and EQT and certain Purchase Orders dated March 19, 2015 and July 13, 2015, EQT retained Gould as an independent contractor to perform excavation and pipeline construction work with respect to a pipeline project that involved the use of the EQT ROW located in Armstrong County, Pennsylvania. A copy of the MCSA is attached as "Exhibit 1."[1] Gould initially was retained to perform excavation work, but the scope of the work subsequently changed, pursuant to a Change Order Notice, to include the full construction of the pipeline project (NITR-S002).

12. This pipeline construction project began on July 14, 2015. The project involved the installation of a 3,800 foot 8-inch steel pipe for suction and a 3,800-foot steel pipe for gas distribution services.

13. Gould, as the contractor, had control of the worksite.

14. On July 15, 2015, Jamey Stover, a 43-year old Gould employee, began performing excavation work on the EQT pipeline project. While operating a John Deere 750 J bulldozer and while acting within the scope of his role as a Gould employee, Mr. Stover struck a 12-inch polyethylene natural gas line.

---

[1] The MCSA was executed before the merger of Kentucky West Virginia Gas Company, LLC, into EQT.

15. As a proximate result of the "line strike", Mr. Stover suffered severe burns to approximately 80% of his body and subsequently died in the UPMC Burn Center on September 8, 2015.  He is survived by his wife, Stephanie Diane Stover, and his son, James W. Stover.

16. The 12-inch underground gathering line struck by Mr. Stover was owned and operated by Snyder Associated Companies, Inc. ("Snyder").  According to its website, Snyder "is one of the largest, privately funded, independent producer of natural gas in Pennsylvania…. Snyder … produces in excess of 50,000 MCF per day in Armstrong, Indiana, Clarion, Warren, Jefferson, Fayette, Westmorland, McKean and Clearfield Counties."

17. The fact that Snyder was one of the largest, privately funded, independent producers of natural gas in Pennsylvania was common knowledge to individuals and entities, such as Gould, operating in the natural gas industry in Pennsylvania and West Virginia.

18. On July 9, 2015, prior to the initiation of the work on the pipeline project, Gould contacted the Pennsylvania 811 One-Call ("One-Call system") for the purpose of having underground utilities marked within the ROW before the start of work on July 14, 2015.

19. The 12-inch gathering line at issue was not identified through the One-Call system.  The fact that One-Call did not identify the Snyder gathering line is not surprising given that gathering lines of this nature are "unregulated" in Pennsylvania and do not have to be reported to the One-Call system.

20. The fact that gathering lines like the Snyder gathering line are not part of the One-Call system was known, or should have been known, to Gould upon reasonable investigation.

21. Additionally, the Snyder gathering line should have been discovered upon a reasonable inspection inasmuch as the Snyder gathering line location was marked where it crossed a road in close proximity to the pump station.  There were visible vent pipes extending

several feet above the ground level immediately proximate to the excavation work being undertaken at the time of the line strike.  A reasonable and thorough inspection of the planned worksite, including at a minimum walking the expected pathway of the EQT lines or any visual scanning of the area before the initiation of excavation work would have revealed the potential presence of the Snyder gathering line.

22.     The MCSA makes clear that Gould had the responsibility to make the work site safe: "Contractor agrees to furnish its best skill and judgment when discharging its obligations hereunder and to complete the work in a good, workmanlike, safe, expeditious, and economical manner, free from defects ….'

23.     The MCSA further provides that Gould accepted and was familiar or had familiarized itself with "the conditions affecting construction at the Project Site where the work is to be performed."

24.     Gould also expressly accepted responsibility "for the prevention of accidents and injury in the vicinity of or connected with [its] work."

25.     Gould was obligated pursuant to the MSCA to comply with several EQT policies and requirements, including "EQT Midstream Design and Construction Manual" (hereinafter "Design and Contractor Manual") and EQT's "Contractor Safe Work Rules.  Relevant portions of the Design and Construction Manual are attached hereto as "Exhibit 2."  Relevant portions of the Contractor Safe Work Rules are attached hereto as "Exhibit 3."

26.     EQT's Design and Contractor Manual, which was provided to Gould along with Bid documents, charged Gould with the duty to locate foreign lines.

27.     Section 8.1 of EQT's Design and Construction Manual required Gould to notify "any other private companies … which may have facilities in the vicinity of construction…'

prior to starting work. Gould failed to identify the Snyder pipeline prior to starting construction. *See*, Exhibit 2.

28. EQT's Contractor Safe Work Rules required contractors, such as Gould, to take precautions as it related to underground pipelines. Specifically, the "estimated location of… any other underground installations that reasonably may be expected to be encountered during excavation work, must be determined prior to opening an excavation. Gould failed to make this determination with respect to the Snyder line. *See*, Exhibit 3.

29. In addition to these written duties, industry standards and common practices required excavators such as Gould to locate unmarked lines and to take steps necessary to make the work site safe.

30. Industry Standards have been established by the Common Ground Alliance's ("CGA") Best Practices in 2016. These recommended standards establish that Gould, at a minimum, should have met with Snyder to discuss its plans for excavation so that Snyder had an opportunity to disclose the location of its unmarked line. Gould failed to meet with Snyder.

31. The CGA recommended standards also require an excavator, such as Gould, prior to excavation, to check for unmarked facilities to the best of their ability. At a minimum, this required Gould to check for visible signs of unmarked lines, such as line markers or vent pipes, and to check for lines that were unregulated and not part of the One Call System. The Pennsylvania One Call sheet reflects that Gould was aware that the Snyder lines were not identified on the One Call sheet. Gould failed to exercise its best ability to check for unmarked lines.

32. The National Utility Locating Contractors Association ("NULCA") Excavation Practices and Procedures for Damage Prevention (September 17, 1997) make it plain that Gould had a duty to locate unregulated lines.

33. The Pennsylvania One Call Act (the "Act") establishes that Gould, as an excavator, had a duty to communicate with Snyder. (73 P. S. § 176 et. seq.) Gould was specifically required under the Act to take "all reasonable steps necessary to avoid injury." Gould failed to exercise reasonable care and take all reasonable steps to avoid injury to Mr. Stover.

34. Prior to initiating work on the EQT pipeline project, Gould was required to execute a Hold Harmless Agreement with Snyder, a copy which is attached as Exhibit 4. In this Agreement, Gould agreed to indemnify Snyder as against any and all liability, loss or expense for all injuries or damage to any person, including Gould employees, arising out of or caused by the acts or omissions, negligent or otherwise, of Gould, including its employees, in performing the "obligations or services" under this Agreement.

35. Gould knew or should have known that Snyder was the owner/operator of the site over which the ROW extended. By virtue of its execution of the Snyder HHA, Gould knew or should have known that Snyder had operations and conducted activities on or in proximity to the ROW. In spite of this knowledge, Gould failed to undertake any reasonable investigation to ascertain what Snyder facilities, installations or pipelines were in the vicinity of its expected excavation activities.

36. Excavators, such as Gould have the duty to locate "facilities" and to protect against harm to human life (Utility Line Protection Act 73 P.S. § 176, et al.). In fact, the EQT Contractor Safe Work Rules, which Gould was obligated to comply with pursuant to the MCSA,

made clear that "the estimated location of utility installations … or any other underground installations that reasonably may be expected to be encountered during excavation work, must be determined prior to opening an excavation." *See*, Exhibit 3.

37. It is common knowledge in the area where the incident occurred that natural gas gathering lines are plentiful and constitute a significant hazard and should have been reasonably expected to be in the area of the ROW. Minimally, Gould had the duty to make inquiry of EQT and Snyder as to the possibility of unregulated gathering lines being present on or near the ROW where excavation work was to take place.

38. Gould had statutory and common law duties to locate the unmarked and unregulated Snyder line.

39. Gould failed to exercise reasonable care under the circumstances and, as a consequence, breached its duties to locate unregulated and unmarked gathering lines in the vicinity of the ROW and to protect against harm to human life.

40. The pipeline construction project and excavation work undertaken by Gould, which is at issue herein, was subject to the MCSA dated May 20, 2008.

41. The MCSA provided in section 12.1 that "[t]o the fullest extent permitted by law, [Gould] shall defend, indemnify and hold harmless [EQT] … from and against any and all claims, demands, causes of action, damages, liabilities, judgments … costs and expenses, including attorneys' fees and other costs of defense, arising out of or resulting from [Gould's] work or other performance under [the MCSA] and/or attributable to: (a) the negligent … act or omission of [Gould], its … employees …or (d) [Gould's] failure to comply with Applicable Laws, Safety Rules or Permits.

42. The MCSA further provided that "[t]he defense and indemnification obligations accepted by [Gould] … apply regardless whether any such Claim and Expenses are caused or claimed to have been caused in part by [EQT]. To the fullest extent permitted by law, it is the intent of the parties that [Gould's] defense and indemnification obligations shall indemnify [EQT] against their concurrent negligence, if any. However, [Gould] shall have no obligation to indemnify [EQT] against its sole negligence or willful misconduct." *See*, Exhibit 1.

43. In the absence of EQT's sole negligence, Gould was contractually obligated to indemnify, defend and hold EQT harmless for any claim from and against any claim or demand with respect to costs and expenses, including attorneys' fees and other costs related to its work or attributable to the negligent act or omission by Gould or its employees or its failure to comply with EQT safety rules.

44. The Travelers Indemnity Company issued a Commercial General Liability Insurance policy to Gould, which policy provided general liability and indemnity coverage to Gould for personal injuries, including wrongful death, in the amount of $1,000,000.00 per occurrence. The policy bore number DTCO 5614B585TIA14. Travelers Casualty Insurance Company of America also issued a Commercial Excess Liability Insurance Policy to Gould in the amount of $5,000,000.00 per occurrence. This policy bore number DTSM CUP 5614B585 IND14. These policies are collectively referred to henceforth as the "Travelers Policies."

45. EQT is an additional insured under the terms and conditions contained in the Travelers Policies pursuant to the Blanket Additional Insured (Contractors) endorsement of the policies as well as other terms and conditions under the policies.

46. By letter dated October 13, 2016, Mr. Stover's Estate, through counsel, made a demand on the various entities involved in the accident. As part of said demand, counsel

asserted that medical expenses as of October 18, 2016, were a confidential amount in excess of the required maximum insurance coverage required to be provided under Plaintiffs' contract with Gould. A Report prepared by Dan Selby, MBA, CPA, was provided which quantified the present value of pre-injury income capacity between $1,074,051.00 to $1,304,721.00. Lost household services were quantified at $576,485.00.

47. Pre-suit mediation was held on April 20, 2017. The matter settled for a confidential amount during mediation. Subsequently, the Circuit Court of Jackson County, West Virginia, which approved the settlement during a Summary Proceeding, found the settlement to be fair and reasonable.

48. Despite having been advised of the amount of the settlement, neither Gould nor its insurers, the defendant Travelers Indemnity Company and Travelers Casualty Insurance Company of America, have disputed that the settlement was fair and reasonable.

49. As set forth herein, Gould failed to exercise reasonable care under the circumstances, breached its various duties to locate unmarked and unregulated lines and was negligent.

50. Gould continues to refuse to indemnify, defend and hold EQT harmless for the amounts paid by EQT to compromise the claims and/or the attorneys' fees and costs incurred therein.

51. The Travelers Indemnity Company and Travelers Casualty Insurance Company of America also have refused and continue to refuse to indemnity, defend and hold EQT harmless as additional insureds under their insurance agreements with Gould. The first denial of these claims occurred on May 31, 2016, with Travelers continuing to deny the claims through the

settlement of the claims in June of 2017, despite the receipt of additional information regarding the same.

## COUNT I – BREACH OF CONTRACT
## TRAVELERS AND TRAVELERS CASUALTY

52. EQT realleges and incorporates herein paragraphs 1 through 5 as if set forth verbatim herein.

53. As a direct and proximate result of the line strike on July 15, 2015, EQT has sustained substantial damages, losses, costs and expenses, including, but limited to, the confidential monies expended in settlement of Mr. Stover's estate claim, the guardian ad litem fees, mediation fees, and attorneys' fees, costs, and other expenses related to said claim. Defense costs associated with the defense and settlement of the case alone are in excess of $183,000.00.

54. Pursuant to the MCSA, Gould has a contractual duty to indemnify, defend and hold EQT harmless for all damages, losses, costs and expenses arising out of its negligent acts or omissions, unless EQT was solely negligent. As set forth above in paragraphs 1 through 52, Gould was negligent. Because Gould was negligent and, therefore, EQT was not solely negligent, Gould is contractually obligated to indemnify, defend and hold EQT Harmless with respect to the underlying Stover matter.

55. Despite repeated written and oral demands by EQT seeking indemnity, and to be held harmless of all such losses and damages caused by Gould's breach of the MCSA, Travelers has failed to honor Gould's obligations under the MCSA and its obligations under the insurance agreements.

56. Because Gould breached the MCSA and Travelers has failed and continues to fail to indemnify, defend and hold EQT harmless for its losses, they are each in breach of the MCSA

and Travelers is in breach of its agreements under its insurance contracts, all of which have caused EQT harm.

57. As alleged in paragraphs 1 through 56, Gould had a contractual duty to defend and indemnify EQT and further had an obligation to obtain liability insurance for the benefit of EQT for the purpose of securing the means to provide the defense and indemnification under facts and circumstances such as those presented by the Stover Estate. Although Gould did secure the requisite insurance coverage through the Travelers Policies, the Travelers Indemnity Company and Travelers Casualty Insurance Company each have failed and/or refused to indemnify, defend or hold EQT harmless as required by the terms and conditions of the insurance policies, despite having been afforded and opportunity to do the same before EQT was able to reach a settlement with the Stover estate.

58. This failure and/or refusal is a breach of the duties of the Travelers Indemnity Company and Travelers Casualty Insurance Company to provide insurance to EQT as an additional insured under the subject insurance policies.

59. As a proximate result of the Travelers Companies' breach of their duties to EQT, EQT has suffered damages and been harmed in amounts including but not limited to the full amount of total insurance provided by the primary and excess insurance policies as required to contribute to the settlement of the Stover claims, the costs of defending the claims brought by the Stover Estate, and the reasonable attorneys' fees and costs incurred in the prosecution of this first-party claim for breach of contract against EQT's own insurance carriers as contemplated under *Hayseeds v. State Farm Mutual Insurance Company*.

**WHEREFORE,** EQT Gathering, LLC, demands judgment from and against The Travelers Indemnity Company and Travelers Casualty Insurance Company of North America, in

amounts to be determined by jury, said amounts are in excess of this Court's minimum jurisdictional amount, to adequately compensate it for its damages and losses, together with prejudgment and post-judgment interest, mediation fees, guardian ad litem fees, attorneys' fees and costs associated with the investigation and resolution of the underlying claim and with respect to this action, as well as such other and further relief this Honorable Court deems just, fair, equitable and appropriate under the circumstances.

**PLAINTIFF DEMANDS A JURY TRIAL.**

EQT GATHERING, LLC,

**By Counsel.**

*/s/ R. Scott Long*          *03/05/2018*
R. Scott Long, Esquire (#2238)
David F. Nelson, Sr., Esquire (#5754)
**HENDRICKSON & LONG, PLLC**
214 Capitol Street (zip 25301)
P.O. Box 11070
Charleston, West Virginia  25339
(304) 346-5500
(304) 346-5515 (facsimile)
scott@handl.com
dnelson@handl.com
*Counsel for Plaintiff*